UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRADLEY D. MUNGLE,                    )
                                      )
         Plaintiff,                   )
                                      )
    v.                                )          No.   4:16 CV 311 RWS (JMB)
                                      )
NANCY A. BERRYHILL,[1]                )
Acting Commissioner of Social Security, )
                                      )
         Defendant.                   )

## REPORT AND RECOMMENDATION

This cause is on appeal from an adverse ruling of the Social Security Administration.  This

suit involves Applications for Disability Insurance Benefits and for Supplemental Security Income.

The Honorable Rodney Sippel, United States District Judge, referred this matter to the

undersigned United States Magistrate Judge for a Report and Recommendation on all dispositive

matters, and for rulings upon all non-dispositive matters.  See 28 U.S.C. § 636(b)(1).  The matter

is fully briefed, and for the reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

## I.    Procedural History

On June 21, 2012, Plaintiff Bradley Dean Mungle ("Plaintiff") filed applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401

et. seq., and for Supplemental Security Income ("SSI") payments pursuant to Title XVI, 42

_____

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be
taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security
Act, 42 U.S.C. § 405(g).

U.S.C. §§ 1381, et seq. (Tr. 261-73).[2]  Plaintiff claimed that his disability began on June 9, 2012, as a result of multiple strokes, diabetes, hypertension, vision problems, heart problems, high cholesterol, migraines, and anxiety.  On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 19, 2014.  (Tr. 167-87)  Plaintiff testified and was represented by counsel.  Vocational Expert Stella Doering answered vocational interrogatories.  (Tr. 259-60, 354-71)  Thereafter, on October 27 2014, the ALJ issued a decision denying Plaintiff's claims for benefits.  (Tr. 147-62)  On April 9, 2015, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review.  (Tr. 1-146)

Plaintiff filed the instant action on March 7, 2016.  Plaintiff has exhausted his administrative remedies and the matter is properly before this Court.  Plaintiff was represented by counsel throughout all relevant administrative proceedings.  Plaintiff's counsel withdrew after the administrative process.  Plaintiff proceeds here *pro se*.

In his *pro se* brief, Plaintiff provides a summary of his medical history, asserting that he has multiple disabilities.  The undersigned has construed Plaintiff's brief as challenging the ALJ's adverse credibility determination and residual functional capacity assessment.  The Commissioner filed a detailed brief in opposition contending that the ALJ's decision is based upon substantial evidence.  After liberally construing Plaintiff's brief, the undersigned finds no error, and for the reasons outlined below, recommends that the Commissioner's decision be affirmed.

## II.  <u>Decision of the ALJ</u>

On October 27, 2014, the ALJ issued an adverse decision denying Plaintiff's request for

---

[2]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer  (ECF No. 12/filed March 9, 2016).

DIB and SSI benefits. The ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 152) The ALJ acknowledged that the administrative framework required him to follow a five-step, sequential process in evaluating Plaintiff's claim. (Tr. 151-52) At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since June 9, 2012, the alleged onset date. (Tr. 152) At step two, the ALJ found Plaintiff had the following determinable impairments during the relevant time period: status post stroke with multiple infarcts, seizure disorder, diabetes, hypertension, status post congestive heart failure, and vision impairment. (Id.) At step three, the ALJ found that Plaintiff did not suffer from any impairment(s) that met or medically equaled the severity of a listed impairment found at 20 C.F.R. Part 404 Subpart P, Appendix 1. (Tr. 153)[3]

Before arriving at step four, the ALJ reviewed the entire record and concluded that Plaintiff retained the residual functional capacity ("RFC") to perform light work to the extent the following limitations were also included: no work at unprotected heights or with dangerous machinery; no work requiring fine visual activity (not better than 20/30 corrected vision); and no work requiring the ability to perform complex assignments or carry out detailed instructions. (Id.)

The ALJ made an adverse credibility finding that no doubt influenced his RFC assessment. The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 155) The ALJ found that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual. He was following up with his primary care physician every three to six months and

_____

[3]The ALJ found that Plaintiff testified to bilateral ankle and knee problems as well as back problems and anxiety at the hearing, but the medical record was devoid of any established diagnoses or treatment for such impairments. Therefore, the ALJ found these impairments to be non-medically determinable impairments. (Tr. 152-53)

with his neurologist every six months (though he had not returned to see Dr. Turpin since November of 2013). In addition, there was no indication that more frequent follow up was necessary." (Tr. 158) The ALJ also considered the evidence showing Plaintiff "has not been entirely compliant in taking prescribed medications or in following recommendations made by his treating physicians, which suggests that the symptoms may not have been as limiting as [Plaintiff] has alleged in connection with this application." (Tr. 159) The ALJ further considered that, although Plaintiff "has received various forms of treatment for the allegedly disabling symptoms, all of which has been routine and/or conservative in nature, which would normally weigh somewhat in [Plaintiff's] favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Moreover, he recovered after each episode, the first in June of 2012 and the second in July 2013." (Id.)

The ALJ found that Plaintiff is unable to perform any past relevant work. (Tr. 160) The ALJ further found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy he could perform, including an arcade attendant, a folding machine operator, and a bagger (laundry/garment). (Tr. 161)

## III. Evidence Before the ALJ

The administrative record in this matter includes a substantial volume of medical records. Although the undersigned has considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the records most relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed. The following is a summary of pertinent portions of the record.

### A. The Hearing Before the ALJ

The ALJ conducted a hearing on August 19, 2014. Plaintiff was present and represented

by counsel.

## 1. **Plaintiff's Testimony**

Plaintiff testified in response to questions posed by the ALJ, with a few additional questions interjected by his attorney regarding side effects from his medications. (Tr. 185-86) Plaintiff testified that he has not worked since June 9, 2012. (Tr. 170, 172) Plaintiff last worked as a tow truck driver, and he stopped working after having a seizure which affected the vision in his left eye. (Id.) At the time of his hearing, Plaintiff was forty-seven years old. (Tr. 170) Plaintiff lives with his father and receives food stamps. (Tr. 184) As for daily activities, Plaintiff testified that he takes the dog outside, finds something to eat, watches television, and dozes off a couple times during the day. (Tr. 176)

Plaintiff testified that his work history also included warehouse work. (Tr. 171) Plaintiff does not think he could drive a tow truck or deliver pizzas because of his diabetes and low energy level. (Tr. 183) Plaintiff testified that he takes medication for anxiety. (Tr. 184)

Plaintiff explained that his diabetes negatively impacts his energy level, and he sleeps a lot because of his blood sugar condition. (Tr. 174) Plaintiff testified that his treating doctor is trying to manage his diabetes and recently referred Plaintiff to a specialist who adjusted his medications. Plaintiff further testified that these adjustments made him feel worse. Plaintiff admitted that he missed his scheduled follow-up appointment with the endocrinologist and had not yet rescheduled the appointment. (Id.) Plaintiff also testified that he has problems with his thought process but he does not remember if he has reported this problem to a doctor. (Tr. 175-76) Plaintiff testified that he has not had a seizure in a year, and his doctor lifted his driving restriction. (Tr. 180-81) Plaintiff takes carbomepenzanine which controls his seizures. (Tr. 181) Plaintiff testified that he has vision problems for which he should be wearing bifocals. (Id.) Plaintiff experiences

headaches three to four times a week, which he treats with over-the-counter Tylenol and Ibuprofen. (Tr. 182)

Plaintiff testified that his girlfriend thinks he sleeps seventeen to eighteen hours a day but he does not agree. (Tr. 175) Plaintiff dozes off a couple times during the day anywhere from two to five hours but Plaintiff admitted that he has not reported this information to his doctors because he does not trust doctors. (Tr. 177)

Plaintiff testified that he cannot sit for more than thirty to forty minutes because his left leg muscles start to hurt. (Id.) Plaintiff cannot stand for more than thirty or forty minutes because of his ankle and knee issues, but since he stopped working, Plaintiff has not received any treatment for his ankle or knees. (Tr. 178) Plaintiff testified that he complained a number of times to his regular doctor about ankle pain. (Tr. 179) Plaintiff testified that he could walk a mile in forty minutes. (Id.) Plaintiff testified that he can occasionally lift fifty pounds and frequently lift twenty pounds. (Tr. 180)

### 2.    Disability Determination Explanations - Dr. Linda Skolnick (Tr. 188-209)

On November 29, 2012, Dr. Linda Skolnick, a state agency psychological consultant, found Plaintiff had no medically determinable mental impairment. Dr. Skolnick noted that despite Plaintiff alleging anxiety, a diagnosis of anxiety was not contained in the medical records, and Plaintiff was not taking any medication for anxiety. Dr. Skolnick noted that Plaintiff's alleged difficulty with concentration, memory, and understanding was caused by his past strokes.

### 3.    Interrogatory Answers of Vocational Expert Stella Doering (Tr. 354-71)

Vocational Expert Stella Doering ("VE") answered vocational interrogatories sent by the ALJ. The VE identified two jobs, a tow truck driver and a newspaper delivery driver, she

considered to be Plaintiff's past relevant work.  (Tr. 366)

The ALJ asked the VE whether someone similar to Plaintiff in age, education, and the same past work experience, with the ability to perform work at the light range but unable to work at unprotected heights or with dangerous machinery and work that does not require fine visual acuity or the ability to perform complex assignments or carry out detailed instructions, could perform Plaintiff's past relevant work.  (Tr. 366-67)  The VE opined that such hypothetical individual could not perform Plaintiff's past relevant work at a light level of exertion.  (Tr. 367)  The VE found that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including an arcade attendant, a folding machine operator, and a bagger (laundry/garment).  (Tr. 388)

### B.  Forms Completed by Plaintiff

In a Function Report - Adult form, completed on September 19, 2012, Plaintiff indicated that his daily activities included watching television or a computer, talking on the phone, doing laundry sometimes, and helping friends with auto repairs.  (Tr. 322)  Plaintiff listed watching television, playing on the computer, and tinkering with cars and trucks with his friends as his hobbies.  (Tr. 326)

### C.  Medical Records and Source Opinion Evidence[4]

---

[4]Plaintiff submitted additional medical evidence on December 1, 2015, documenting medical treatment from December 30, 2014, through October 20, 2015, most of the treatment nearly six months after the ALJ's decision.  (Tr. 8-94, 150-62).  Records of that treatment appear not to have been considered by the Appeals Council although the records were  submitted to the Social Security Administration a month before the January 8, 2016, Appeals Council decision. (Tr. 1-6, 9-94)

The undersigned concludes the additional records submitted by Plaintiff were neither considered by the Appeals Council nor material evidence inasmuch as these records do not appear to relate to the period at issue (on or before the date of the ALJ's decision), and address Plaintiff's conditions and medical treatment after the ALJ's decision.  See, e.g., Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding no error in Appeals Council's decision that new records

1. **General History**

The medical evidence in the record shows that Plaintiff has a history of blurred vision, seizure disorder, migraine headaches, hypertension, diabetes, strokes, and hyperlipidemia.[5] (Tr. 8-146, 376-825) The relevant medical evidence will be discussed in additional detail below, as part of the Court's analysis of the arguments raised by Plaintiff herein.

2. **Barnes-Jewish St. Peters Hospital - Drs. Steven Radal, Andrea Marie Holthaus** (Tr. 9-50, 57-87, 96-146, 668-768, 798-810)

On July 7, 2013, Plaintiff presented in the emergency room complaining of tingling in his left arm and a headache. A CT scan of Plaintiff's head showed no acute abnormality. An MRI of Plaintiff's brain showed possible infarct. The treating doctor diagnosed Plaintiff with transient ischemic attack ("TIA") and wanted to admit Plaintiff for treatment of embolic stroke but Plaintiff eloped after being advised of his admission.

Plaintiff returned for treatment on July 8, 2013, three hours after eloping, stating he returned home to take care of his dogs. The doctor admitted Plaintiff and he received treatment

---

prepared seven months after ALJ's decision described claimant's condition on date records were prepared, not on earlier date, and consequently were not material); Bergmann v. Apfel 207 F.3d 1065, 1069-70 (8th Cir. 2000) (finding material evidence is evidence that relates to the claimant's condition for the time period for which benefits were denied, and not to after-acquired conditions or post-decision deterioration of a pre-existing condition). The Regulations provide that an application is effective through the date of the ALJ's decision. 20 C.F.R. §§ 404.620 and 416.330; see also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (application for disability benefits remains in effect only until the issuance of "hearing decision" on that application, so evidence submitted to appeals council cannot affect the validity of the ALJ's determination if evidence is of treatment claimant received after issuance of the ALJ's opinion).

To the extent these new medical records reflect that Plaintiff became disabled after the date of the ALJ's decision by his condition deteriorating, Plaintiff's recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case. See Riley v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994).

[5]Elevated levels of lipids in the blood plasma. Stedman's Medical Dictionary 922 (28th ed. 2006).

for multiple small acute strokes over the right frontal lobe. An MRI of Plaintiff's brain showed ten small areas of diffusion restriction in the superior right frontal lobe cortex and a focal stenosis, suggestive of a stroke. A cerebral angiogram showed abnormal results, a 60% proximal A1 and M1 segment stenosis and approximately 80% irregular narrowing of the left A1 segment. An echocardiogram revealed no congestive heart failure. Plaintiff underwent carotid arterial catheter placement. The treating doctor recommended that Plaintiff follow-up with a neurosurgeon at the time of discharge on July 10, 2013.

Plaintiff returned on July 12, 2013, and was admitted after presenting with jerking movement of his left upper extremity. An EEG was negative for seizures. The doctor discontinued Topamax and prescribed carbamazepine. During this hospitalization, Plaintiff continued to experience seizures. A CT scan of Plaintiff's brain showed right infarction without interval change in comparison to the study a few months earlier. The treating neurologist diagnosed Plaintiff with recurrent partial seizures, mainly affecting his left upper extremity. The doctor noted that Plaintiff had not been monitoring his glucose closely. Plaintiff denied having any complications of diabetes.

###     3.     St. Peters Family Medicine - Dr. Steven Radel (Tr. 57-60, 607-08, 628-29, 783-94, 811-19)

Between January 15, 2013, and January 6, 2015, Dr. Steven Radel, Plaintiff's primary care physician at St. Peters Family Medicine, treated his diabetes mellitus, hyperlipidemia, and hypertension.

On January 21, 2013, Dr. Radel treated Plaintiff's chest pain. Plaintiff denied having any fatigue or headache during treatment. Dr. Radel determined a negative evaluation and a physical examination showed normal results. Dr. Radel noted that if Plaintiff's chest pain reoccurred, he

would refer Plaintiff to a cardiologist for treatment.

In follow-up treatment on April 24, 2013, Dr. Radel refilled Plaintiff's medication regimen for three months and discussed medication usage. Dr. Radel ordered Plaintiff to continue dieting and follow his medication regimen. Dr. Radel noted that Plaintiff's diabetes has been managed with diet and medications, and continued his medication regimen.

On July 19, 2013, Plaintiff received follow-up treatment after having a stroke. Dr. Radel found Plaintiff's diabetes mellitus to be uncomplicated and his hypertension stabilized by medications. Examination revealed no heart murmur.

On February 6, 2014, Plaintiff returned for treatment, and Dr. Radel found his hypertension and diabetes to be stable, and his hyperlipidemia controlled with medication. Physical examination showed normal results, and Plaintiff denied any problems, other than a headache.

On August 28, 2014, Dr. Radel counseled Plaintiff on medication management. Plaintiff's hyperlipidemia management included improved diet and increased exercise. Dr. Radel noted that Plaintiff's diabetes had been managed with diet; and his hypertension was currently stable.

### 4. **Barnes Jewish Hospital - Drs. Yo-El Ju and Davis Ryman** (Tr. 640-66)

On referral by Dr. Radel on January 31, 2013, Dr. Dr. Yo-El Ju completed an evaluation of Plaintiff's history of stroke and seizure, after his former neurologist stopped seeing Plaintiff due to a change in insurance. Plaintiff denied any difficulty getting dressed, bathing/grooming, speaking, or with activities of daily living including cooking, cleaning, shopping, and driving. Plaintiff reported not having any motor seizures, having some continued blurred vision, and significant improvement of his rosacea. Plaintiff reported that after the June 2012 hospitalization, he started having frequent headaches, but obtained good relief with Tylenol. Dr. Ju noted that

Plaintiff was prescribed Keppra after the June 2012 incident, but Plaintiff discontinued taking Keppra in November when he ran out of the medication. Plaintiff reported that his primary care physician prescribed Topamax, and he had tolerated with no side effects. Examination revealed no clear focal deficits consistent with prior stroke. Dr. Ju noted that there had not been any witnessed seizures, only occasional brief staring spells, since Plaintiff's hospitalization. Dr. Ju continued the existing regimen of Topamax.

In follow-up treatment on April 18, 2013, Plaintiff reported no episodes of neurologic symptoms, and that he continued to feel well since his visit on January 31, 2013. Plaintiff reported being treated by a cardiologist, and that an outpatient stress test showed normal results. Dr. Davis Ryman noted that Plaintiff's primary care physician and his cardiologist had maintained Plaintiff on a medication regimen, and Plaintiff's blood sugars and blood pressure had been under control. Examination showed no residual focal deficits consistent with prior stroke. Dr. Ryman recommended that Plaintiff continue to be treated by his cardiologist and Drs. Radel and Holter monitoring to rule out cardiac arrhythmia. Dr. Ryman continued Plaintiff's medication regimen and discussed the importance of continued control of his blood pressure, cholesterol, and diabetes mellitus. Dr. Ryman instructed Plaintiff to schedule a follow-up appointment in six to eight months.

5.   **BJCMG Neurology Associates - Dr. F. Duane Turpin** (Tr. 52-56, 595-600, 667, 770-76, 795-97, 820-25)

On August 9, 2013, Plaintiff presented at Dr. Turpin's clinic for consultation of his seizure disorder on referral by Dr. Radel. Plaintiff reported using carbamazepine with good results. Dr. Turpin noted that Plaintiff's seizures were simple partial seizures, and his last reported seizure was on July 15, 2013. Dr. Turpin instructed Plaintiff to avoid high risk activity and driving, and

continued Plaintiff's medication regimen.

On November 20, 2013, Dr. Turpin treated Plaintiff for simple partial seizures. Plaintiff had been treated with carbamazepine with good results. Dr. Turpin noted that Plaintiff probably should not yet return to his job as a tow truck driver.

In a "To Whom It May Concern" letter, dated January 16, 2014, Dr. Turpin stated that Plaintiff "is currently under my medical care for a past stroke and seizures. [Plaintiff] should not return to work due to his current condition." (Tr. 667)

Dr. Turpin completed a Medical Source Statement ("MSS"), dated August 15, 2014. Dr. Turpin found Plaintiff could lift/carry six to ten pounds frequently and eleven to twenty five pounds occasionally; sit for two hours in a workday; and stand and/or walk for six hours in a workday.

6. **SSM St. Joseph Health Center** (Tr. 375-474, 549-565, 603-06, 609-27)

On several occasions between November 4, 2011, and January 2, 2013, Plaintiff received medical treatment in the emergency room at SSM St. Joseph Health Center.

On November 4, 2011, Plaintiff sought treatment for a headache and ear pain. The emergency room doctor diagnosed Plaintiff with nonsupportive otitis media and prescribed medications.

On June 12, 2012, Plaintiff received treatment for a migraine headache and blurred vision in the emergency room. The doctor noted that Plaintiff was not nervous/anxious.

On June 13, 2012, the emergency room doctor observed Plaintiff to be unresponsive, to have no corneal reflex, and to be cyanotic, and admitted Plaintiff to evaluate his seizures. Plaintiff also reported having a migraine headache, visual changes, and uncontrolled diabetes. While in the emergency room, Plaintiff had a syncopal episode, loss of consciousness, and arrest but then

Plaintiff started to breathe on his own again. The cardiac work up revealed an ejection fraction of 20% to 30% but no source of embolus was identified. A CT scan of Plaintiff's head showed no acute intra-cranial abnormality. A MRI showed small relatively acute infarcts. An echocardiogram showed left ventricular enlargement and hypertrophy and left atrial enlargement and ejection fraction of 20% to 30%. A ophthalmologist evaluated Plaintiff and diagnosed him with background diabetic neuropathy in both eyes and severe rosacea in each eye and prescribed eye drops. During his hospitalization, the treating doctors prescribed a course of comprehensive interdisciplinary consultations to address his admitting impairments including multiple infarct, diabetes mellitus, hypertension, congestive heart failure, status post cardiac arrest and resuscitation, diabetic retinopathy, and obesity. When discharged on June 22, 2012, Plaintiff was admitted to a rehabilitation facility.

A September 26, 2012, echocardiogram showed normal systolic function in the left ventricle with ejection fraction of 55% to 65%, a moderately dilated left atrium, and otherwise normal findings.

On January 2, 2013, Plaintiff sought treatment in the emergency room for chest pain and hyperglycemia. The emergency room doctor noted that a nuclear stress test six weeks earlier had normal results. Treatment included a cardiac work up. An EKG showed a normal heart rate and no significant change when compared with an EKG of February 21, 2010. An x-ray of Plaintiff's chest showed his heart size to be normal and lungs to be clear. A physical examination showed normal results. At discharge, Plaintiff was in stable condition and instructed to follow-up with his primary care physician.

7. **SSM Rehabilitation Hospital - Dr. Phuong Nguyen** (Tr. 476-531)

On June 22, 2012, Plaintiff was admitted to SSM Rehabilitation Hospital as a transfer

from St. Joseph Health Center.  The treating doctors prescribed a course of comprehensive interdisciplinary rehabilitation to address his admitting impairments and medical conditions including physical therapy, occupational therapy, speech therapy, neuropsychology, and close monitoring.  Dr. Phuong Nguyen coordinated Plaintiff's course of rehabilitation.  On June 28, 2012, the date of discharge from rehabilitation, Dr. Nguyen found Plaintiff to be medically stable in general.  Plaintiff's high blood pressure was under control; his cardiac function was stable; and his diabetes mellitus was fluctuant.  Dr. Nguyen found that Plaintiff had made significant progress overall with the rehabilitation program but recommended Plaintiff not drive because he needed follow-up treatment with an ophthalmologist to treat his visual impairment.  Dr. Nguyen found that Plaintiff made a fairly good recovery in terms of mobility function and strength.  Dr. Nguyen noted that Plaintiff used to be noncompliant with treatment and medications, and he needed follow-up treatment for diabetes mellitus and hypertension.

8. **Volunteers In Medicine Clinic** (Tr. 532-48)

From September 26, 2011 through August 22, 2012, Plaintiff received primary care at the Volunteers in Medicine Clinic.

During treatment on September 26, 2011, Plaintiff reported that he was unwilling to stop smoking, and he does not exercise.  On December 19, 2011, Plaintiff failed to keep his scheduled appointment.

On June 11, 2012, Plaintiff returned for treatment of a headache.  On July 2, 2012, Plaintiff returned and reported being a truck driver and having stopped smoking.  Plaintiff admitted that he had not seen the retina specialist as recommended and not completed his lab work.

Plaintiff returned for follow-up treatment after hospitalization for a stroke on August 22,

- 14 -

2012, and reported that he hoped to get clearance to return to work. The doctor instructed Plaintiff not to drive for six months, to continue his medication regimen, and to return for follow-up treatment in five months.

9. **SSM Healthcare- Dr. Anoj Goel** (Tr. 777-82)

On June 4, 2014, Dr. Anoj Goel started treating Plaintiff's diabetes. Plaintiff admitted that he had run out of all his medications. Dr. Goel prescribed a medication regimen.

10. **Other Record Evidence**

a. *Consultative Examination -Dr. Saul Silvermintz* (Tr. 566-74)

At the request of Missouri disability determinations, Dr. Saul Silvermintz completed a consultative examination on November 20, 2012, after reviewing the SSM St. Joseph Health Center and Rehabilitation records. Plaintiff complained of low back pain and vision problems. Examination showed Plaintiff's heart's rhythm and rate to be regular and no range of motion limitation in his back. Dr. Silvermintz noted that Plaintiff "basically has no physical complaints today except the back ache and his eyes." (Tr. 568) Dr. Silvermintz noted Plaintiff had occasional stuttering due to prior strokes. Plaintiff had no range of motion deficits and a normal gait, and was fully capable of walking on heels and toes. Dr. Silvermintz observed Plaintiff to be able to get on and off the examining table and to move around the examining room without problems. Dr. Silvermintz did not assess any work-related functional limitations.

b. *Consultative Examination -Dr. Robert Lewis* (Tr. 575-80)

Dr. Robert Lewis examined Plaintiff on November 27, 2012, at the request of Missouri disability determinations. Dr. Lewis found that Plaintiff's visual acuity with current glasses is 20/50 on the right eye and 20/40 on the left eye, and he has no significant field loss. Dr. Lewis noted that Plaintiff has mild difficulty reading, possibly due to his strokes.

## IV.    Standard of Review and Analytical Framework

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir, 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), 1382(a)(3)(A).  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(I)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to step four and five.  Step four requires the Commissioner to consider whether the claimant retains the residual functional capacity to perform past relevant work.  § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work.  If the

Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  § 404.1520(a)(4)(v).

## V.    Discussion of Issues

Plaintiff proceeds herein *pro se*.  Plaintiff filed a handwritten brief, dated August 1, 2016, which is signed by Plaintiff and Ruth Mungle.  Plaintiff's brief does not clearly identify any specific issues for review, but recounts his symptoms and some of his limitations, along with citations to the record.  The undersigned has liberally construed Plaintiff's brief as challenging the ALJ's decisions which run contrary to his allegations of disability, namely:  (1) the ALJ's adverse credibility finding; and (2) the ALJ's residual functional capacity ("RFC") determination.[6]

### A.    Adverse Credibility Determination

The undersigned first addresses the ALJ's adverse credibility determination.  The Eighth Circuit has instructed that the ALJ is to consider the credibility of a plaintiff's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  See also 20 C.F.R. §§ 404.1529, 416.929.  The factors identified in Polaski include:  a plaintiff's daily activities; the location, duration, frequency, and intensity of symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment and measures other than medication received; and any other factors

---

[6]Plaintiff's brief does not appear to raise any meaningful concerns regarding the ALJ's findings that his ankle, knee and anxiety issues were non-medically determinable impairments. (Tr. 152-53)  Although Plaintiff briefly mentions anxiety, he also indicates that the doctor made no statement regarding that matter.  (ECF No. 16 at p. 3)  Further, the undersigned has no reason, based on the record before the Court, to doubt the ALJ's conclusion that none of Plaintiff's impairments, either singly or in combination, meets or equals a listed impairment.  Therefore, the undersigned focuses on the ALJ's credibility and RFC determinations, as those matters most directly impact the question of whether substantial evidence supports the ultimate disability determination in this matter.

concerning impairment-related limitations. See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to discuss each Polaski factor and how it relates to a plaintiff's credibility. See Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility").

This Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015) (citing Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)). See also Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). As explained below, the ALJ's adverse credibility determination is well-supported and justified. Upon a review of the entire record, the undersigned concludes that the ALJ gave good reasons for the credibility determination and that determination is supported by substantial evidence. Accordingly, the undersigned recommends that the Court defer to the ALJ in this regard.

First, the ALJ properly considered that the record medical evidence did not support Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms.

See 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence ... is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, have on your ability to work."); Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (absence of objective medical evidence to support the complaints is a factor to be considered). Contrary to Plaintiff's allegations of disabling impairments, the objective medical findings contained in the medical record do not support the degree of limitation alleged by Plaintiff. See Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (deferring to ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments). The record in this case was indeed arguably lacking in the objective medical evidence showing disabling limitations. As noted by the ALJ, Plaintiff received follow-up treatment with his primary care physician every three to six months and with his neurologist a total of four times. The record includes findings of normal EKG and EEG results, stable cardiac function, stable diabetes, stable hypertension, and normal physical and neurological examination.

In further support of his credibility findings, the ALJ noted that the medical evidence demonstrated that Plaintiff's impairments were adequately controlled by treatment and medications. The ALJ acknowledged that, although Plaintiff had a history of stroke/seizure episodes in June 2012 and July 2013, Plaintiff recovered after each episode. "If an impairment is controlled by treatment or medication, it cannot be considered disabling." See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) Substantial evidence supports the ALJ's conclusion that Plaintiff's impairments had been controlled with treatment. During treatment on January 31, 2013, Dr. Ju noted that there had not been any witnessed seizures, only occasional brief staring spells, since Plaintiff's hospitalization. In follow-up treatment on April 18, 2013, Plaintiff

reported no episodes of neurologic symptoms. As another example, in August 2014, Dr. Radel found that Plaintiff's diabetes had been managed with diet and his hypertension was stable.

The ALJ also found that Plaintiff was not compliant with all prescribed treatment, specifically noting that Plaintiff failed to take prescribed medications and to follow recommendations made by his treating physicians. (Tr. 159) See Gulliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against plaintiff's credibility); see also 20 C.F.R. §§ 404.1530, 416.930 (unjustified failure to follow prescribed treatment is grounds for denying disability). The medical record evidence showed Plaintiff ran out of medications and failed to lose weight and exercise as recommended by doctors to help manage his diabetes.

The ALJ also considered the generally conservative and routine nature of Plaintiff's treatment. Conservative treatment is consistent with discrediting a claimant's allegations of disabling pain. See Kamann v. Colvin, 721 F.3d 945, 950-51 (8th Cir. 2012) (noting that the ALJ properly considered that the claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms."); see also Milam v. Colvin, 794 F.3d 978, 985 (8th Cir, 2015) (finding substantial evidence of claimant's relatively conservative treatment history supported the ALJ's discount of claimant's subjective complaints of pain); Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) ("[Claimant's] complaints of disabling pain and functional limitations are inconsistent with her failure to take prescription pain medication or to seek regular medical treatment for her symptoms."). The record evidence supports the ALJ's finding that Plaintiff routinely received conservative treatment for his impairments.

Plaintiff's reported daily activities were also inconsistent with his allegations of total disability. Plaintiff's reported daily activities included managing his personal care independently,

doing laundry weekly, driving and going out alone, shopping in stores, managing his finances, watching television and movies, playing on the computer, spending time with family and friends, tinkering with cars with friends, and attending a weekly Jeep night. The ALJ noted these activities were inconsistent with his allegations of disabling impairments.

The Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). Yet Plaintiff's daily activities can also be considered as inconsistent with his subjective complaints of a disabling impairment. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the claimant watched television, read, drove, and attended church in concluding that subjective complaints of pain were not credible).

Because Plaintiff's daily activities can fairly be seen as inconsistent with his allegedly disabling symptoms, substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints do not support a finding of total disability.

Similarly, the ALJ properly considered that the lack of any restrictions on Plaintiff's daily activities or functional or physical limitations placed on him by his physicians detracts from his credibility. See Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009) (holding that "[a] lack of functional restrictions is inconsistent with a disability claim"); Samons, 497 F.3d at 820-21 (affirming adverse credibility determination, in part, by absence of any functional limitations placed on claimant who described disabling back pain). Although Dr. Turpin had initially opined Plaintiff should not yet return to his job as a tow truck driver and Plaintiff should not return to work due to his current condition, by August 2014, Dr. Turpin opined that Plaintiff could

lift/carry six to ten pounds frequently and eleven to twenty five pounds occasionally, sit for two hours in a workday, and stand and/or walk for six hours in a workday. Likewise, Dr. Radel encouraged Plaintiff to exercise and placed no functional or physical limitations on Plaintiff. Plaintiff himself testified that he could carry a fifty pound bag of dog food from the car into his house. (Tr. 180)

Based on the foregoing, the undersigned concludes that the ALJ gave good reasons for his adverse credibility finding, and substantial evidence in the record as a whole supports that finding in this case. See Gregg, 354 F.3d at 713.

## B.   Residual Functional Capacity ("RFC")

A claimant's "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations omitted). A claimant's RFC must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. See Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). While an ALJ is not limited to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Ultimately, a claimant's RFC is a medical question which must be supported by medical evidence contained in the record. See Casey, 503 F.3d at 697; see also Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). With physical impairments, evidence of symptom-free periods offers strong evidence against a physical disability. Obermeier v. Astrue, Cause No. 07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008).

An "RFC assessment must [also] include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and

nonmedical evidence (e.g., daily activities, observations)." SSR-96-8p, 1996 WL 374184, at *7 (1996). When determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). As noted above, the ALJ found Plaintiff not to be entirely credible, and this conclusion is supported by substantial record evidence.

In this case, the ALJ found that Plaintiff retained the physical ability to perform light work to the extent the following nonexertional capabilities and limitations are included: no work at unprotected heights or with dangerous machinery; no work requiring fine visual activity (not better than 20/20 corrected vision); and no work requiring the ability to perform complex assignments or carry out detailed instructions. (Tr. 153)[7]

Substantial evidence, including medical evidence, supports the ALJ's RFC assessment. Although the record supports the presence of some medical impairments that cause limitations related to Plaintiff's abilities to perform work-related activities, the ALJ accounted for those limitations by restricting Plaintiff to light work with additional limitations such as protecting

---

[7] Although the body of the ALJ's decision included a restriction to "simple, routine and repetitive tasks in the residual functional capacity to account for any residual effects from [Plaintiff's] strokes," the bold heading denoted as ¶ 5 in the RFC assessment included a differently worded restriction. In particular, the bolded portion limited Plaintiff to "work that does not require the ability to perform complex assignments or carry out detailed instructions." The undersigned does not believe the difference in language/terminology reflects a meaningful inconsistency. To the extent the difference in language is erroneous, it is harmless; it has no practical effect on the outcome of the case and would not provide a legal or factual reason to reverse the ALJ's decision. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand."); Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) ("An arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome.") (internal quotations omitted).

Plaintiff from hazardous conditions, eliminating jobs that require fine vision skills, and limiting Plaintiff to work that does not require complex assignments or the need to carry out detailed instructions. (Tr. 153)

First, the ALJ found that the medical record does not show that any consultative physician imposed any functional restrictions of Claimant or found him to be totally disabled. The ALJ also considered the medical opinion evidence from Plaintiff's treating neurologist, Dr. Turpin. Dr. Turpin's own records and opinions support the ALJ's conclusion that Plaintiff's neurological problems were improved with treatment and did not preclude all work-related activity. The ALJ properly concluded that Dr. Turpin's January 16, 2014, letter which opined that Plaintiff was unable to work due to his current condition of seizures was not a medical opinion but rather an opinion on the application of the statute, a task assigned solely to the discretion of the Commissioner. See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

More significantly, the ALJ observed that Dr. Turpin's subsequent MSS, dated August 15, 2014, was inconsistent with a finding of total disability. In his August 15, 2014, MSS, Dr. Turpin also opined Plaintiff could lift/carry six to ten pounds frequently and eleven to twenty five pounds occasionally, sit for two hours in a workday, and stand and/or walk for six hours in a workday. Thus, Dr. Turpin must have believed that Plaintiff's condition had improved because the MSS concluded that Plaintiff was capable of doing various work-related activities. This MSS is generally consistent with the ALJ's RFC determination.

Further, Dr. Skolnick found that Plaintiff had no medically determinable mental impairment, and that Plaintiff's alleged difficulties with concentration, memory, and understanding

were caused by his past strokes. (Tr. 188-209) The ALJ did not ignore these difficulties. Rather, the ALJ accounted for them by excluding work at unprotected heights or with dangerous machinery, eliminating work that required fine visual skills, and eliminating work that might include complex assignments or detailed instructions. (Tr. 153)

Plaintiff's conservative treatment, management with medication, and lack of required surgical intervention also support the ALJ's RFC determination. See Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Record evidence in this regard is discussed above in connection with the ALJ's adverse credibility finding and will not be repeated here.

Finally, the ALJ's RFC is arguably more restrictive than Plaintiff's own reported activities. The ALJ restricted Plaintiff to light work. Yet, Plaintiff testified that he could occasionally carry a fifty pound bag of dog food, and reported activities and hobbies that included playing on the computer, tinkering on cars and trucks, as well as routine household chores.

After reviewing the record in this matter, the undersigned concludes that the ALJ properly determined Plaintiff's RFC after evaluating all the record evidence regarding the effects of his strokes and other substantiated impairments. The RFC is based on medical evidence and the ALJ's assessment of Plaintiff's subjective complaints. Therefore, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence in the record as a whole.[8]

**VI.** **Conclusion**

For the foregoing reasons, the undersigned concludes that the ALJ's decision is supported

_____

[8] Having concluded that the ALJ's RFC analysis is supported by substantial evidence, the undersigned submits that there is no basis in the record to conclude that the ALJ erred at steps four or five of the required analysis. Further, nothing in Plaintiff's brief suggests meaningful error in this regard. The ALJ's conclusion that Plaintiff could find work consistent with his RFC is supported by testimony from a vocational expert. (Tr. 161-62)

by substantial evidence on the record as a whole, is within the zone of choice, and should not be reversed for the reasons set forth above. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Accordingly, the undersigned recommends that the decision of the ALJ be affirmed.

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of January, 2017.